and Austin B.A. minors. And we have Amber Sangez. I'm actually Michelle Blackburn. And I see that you, okay, so there were two judges, I mean two attorneys listed, but you are Miss Blackburn. You're going to present argument. And then we have Miss Shanahan for the appellee. So you may begin, Miss Blackburn. May it please the court, counsel. My name is Michelle Blackburn. I represent the respondent in this case, Tim Abbott, who is the father of Sophia and Austin Abbott. In the briefs that were filed by myself and my associate in this case, we provided the court with an extensive history of the case because we felt like it was necessary for the court to be aware of the errors that were made in this case from the very beginning. As the court is aware, this is a DCFS case. This is an appeal from a DCFS case. And the issue before this court is whether the trial court erred when it found that our client, Mr. Abbott, was unfit and placed Sophia and Austin in the custody of DCFS. Your Honor, the purpose, as the court is aware, of the Juvenile Court Act is, and I quote, to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal. The, of course, most important language, most important word in that statutory language is only if. Only if and only when his or her safety or welfare cannot be adequately safeguarded without removal. As this court is, I'm sure, aware there is a two-step process for removal of a child, or children in this case, from their parents and making them Lords of the Court. The first step in that, of course, is the adjudicatory process. And that, of course, is not in dispute today. Adjudication was admitted or stipulated to, if you will, by Ms. Abbott, Samantha Abbott, who was the only parent in this case that the allegations were against. So the issue before this court is the second step of that process, which is the dispositional portion of that hearing, wherein the court determines whether it's consistent with the health, safety, and best interest of the minors and the public that the minors be made Lords of the Court. The appellate court in People v. Heather M. provided that, and I quote again, prior to committing a minor to the custody of a third party such as DCFS, the trial court must first determine whether a parent is unfit, unable, or unwilling to care for the child, and whether the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents. That language from that case also is implied in Section 2-27 of the Juvenile Court Act that says that it must be both parents who are judged unfit and unable to care for a child before placement with DCFS is authorized. When we went to dispositional hearing in this case in September of 2018, after the close of all of the evidence, I reminded the court that that was the standard, that the standard was that the court had to find not only Ms. Abbott unfit, but they had to find as well that my client, Mr. Abbott, was unfit, or they could not, the court could not place custody or guardianship with DCFS. The court in its finding found my client to be unfit based upon the fact that he had had what the judge referred to as a lack of contact with the children prior to DCFS involvement and his failure to engage in services with DCFS. Now how many years had he not had any contact? It had not been years, Your Honor. I know it was 2011. From then on, or did he have contact after? Yes, he did. And who was the contact? So Mr. Abbott's testimony, which was the only testimony with regard to contact with the children, was that the parties separated, Samantha and Tim separated in 2011. Thereafter, rather than getting a divorce, they lived separate. They had an agreement whereby Tim would pay child support to Samantha, and that he would have visitation every other weekend. Now, Tim acknowledged that there had been times since 2011 where he had not been able to have visitation every other weekend for any one of a number of reasons. I don't think he went into specifics as to what those reasons were. Well, I thought there was some kind of reason that he had a son die. Right. Was that from a prior engagement of some sort? No, that was a younger child. That was a child that was younger than these two children and Samantha and Austin. And that child had passed away due to some sort of illness. I don't even recall, frankly, what the illness was, but it was an illness that they knew was going to eventually take that child's life. I think the child was only maybe a couple of years old. But he was claiming that kind of messed him up some way. I believe that his testimony was that he did take some time after that because he had trouble processing that death as any parent would and needed some time because he did not want Austin and Sophia, excuse me, to see him. Now, did that child die after 2011 or before 2011? After 2011. And do you know what date that was? I don't. I'm sorry. I think it was. And did he have the child at that time? Where was the child? He was in a relationship with the child's mother when the child passed away, yes. Okay. And so there had been a period of time. I believe Tim's testimony was he had last physically seen the children before they were taken in November. In August of 2017, had a visit with them. And then he had most recently spoken to them or communicated with them in October of 2017, so approximately a month before the children were taken into care. And he was not taking the children to his house or whatever it was because they didn't know where he lived or he got served. They tried to serve him at the wrong address. No, the children knew where he lived. But the sheriff didn't. DCFS claimed they didn't know where he lived. But, well, the interesting thing about DCFS not knowing where he lived is he lives three minutes from the residence where they placed these children, which is Mr. Abbott's aunt. So there is no reason that they should not have known where Mr. Abbott was residing. Well, they did have another address, didn't they? Well, no, the first address that they used was the same address as Ms. Abbott's address, which is the house that they had raided. But, well, he wasn't served and he knew of the hearing. No, he did not know of the November 9th hearing. So the children were taken on November 7th and the petition for shelter care was filed November 9th. He had not been contacted yet by DCFS and not been notified that these children were even in care. He found out on November 10th from his uncle that the children had been taken into care and then reached out to the child investigator, finally got a hold of her. I think November 10th was a Saturday. He finally got a call back from Ms. Burgess, the child investigator, on the 15th, inquired as to why his children were not placed with him and essentially was told they had been placed with the aunt and that was the decision that had been made. And then, after that, he was served with notice for a hearing, not shelter care, but a hearing on December 20th, I believe it was. Okay, and excuse me because I did have the timing wrong. The state contends that there was a hearing held on the 16th, November, that he was aware of and chose not to attend. Is that correct? I don't believe that's...hang on, let me look through my... Or you dispute that, I guess would be the better way to put that. I don't...there was not a hearing... Temporary custody hearing was held on November 16th. No, and I think where the confusion comes in there... And the respondent did not attend. There was not a temporary custody hearing on November 16th. The November 9th hearing, that order was not entered until November 16th. So there was a delay between the time that the actual hearing took place on the 9th and the entry of the order on the 16th. Because we were confused by that as well when the state made that argument and went back through the record and looked. There was not a secondary hearing. So my client was never served with summons until December 7th of 2017. And that is for this hearing that took place on December 20th, which was not a shelter care. It was a first appearance hearing. So you're saying that there was, even though they say that there was a hearing held on the 16th, you're saying there was no such thing. That's correct. Okay. Yeah. I'll ask Ms. Shanhan about that and then get her response. Okay. So first, again, going back to the visitation issue. So then my client gets in touch with Ms. Burgess on November 15th. And then nothing is done to set up any sort of visits for him or give him any sort of explanation about any further explanation about why the children are placed with his aunt instead of him until I believe it was December 19th. December 19th, which was the day before the first appearance, is the first time that he gets contacted about setting up any sort of visitation with these children. So by the time he gets to his actual first appearance, we are 43 days since these children have been taken into care. I thought somebody was looking for trying to serve something, a notice on him, or they sent a notice to a different address. He's in Palmyra, I think, isn't he? He is in Palmyra. That can't be where it is. No, I don't believe that it is. But they sent the notice to his, where did they send the notice? Or did they send it or take it? Well, they took it. So the Sheriff's Department originally tried to serve him at a Morrisonville address. Why did that address come up? I have no idea. Well, sorry. Originally they tried to serve him at the same address where Ms. Abbott lived and, of course, knew very quickly. Was that in Morrisonville? Yes, that's in Morrisonville as well. But then they tried to serve him at a second Morrisonville address. And what's that? Is that a trailer? I don't know, Your Honor. Sorry. But at any rate, I don't know. Nobody knows where they got, so my client doesn't know. Maybe somebody else knows. My client has no idea where they got that address from. My client has been at this Palmyra address since 2016. But they were trying to serve him, going around trying to serve him anyhow. Well, I guess in theory they were going around to addresses. But by November 15th when my client spoke to Ms. Burgess, Ms. Burgess should have had at that point in time his actual address. So why they would continue to try to serve him at some address other than his Palmyra address, I have no idea. So then with regard to the visitation, so they set up visitation for my client. Originally him and Ms. Abbott are visiting together. And at some point in time, Kimmerer Village decides that they don't want to do that that way anymore, so they separate the visits. And from that point until, frankly, until now, my client has these one-hour visits with his children. So by the time we came to disposition and went through the dispositional hearing, my client had been visiting as much as Kimmerer Village would allow him to visit since November. And prior to that, the only testimony with regard to when he was visiting was testimony from my own client. The only other testimony about any sort of visit was the testimony of, and I believe her name was Angel McDonald, who was the caseworker at the time. Or maybe it was Ms. Burgess. Anyway, it was someone from the organization who indicated that Samantha had told them that he hadn't had any contact with the kids. But the state doesn't put Samantha on the stand to testify as to what contact was or was not happening. Nobody else testifies. So really the only evidence, the only credible evidence, by anybody who was actually participating in visitations was my client, who said, I was visiting, I had my last visit in August, spoke to the kids in October, and now I've been visiting all except for, I believe there was one visit they canceled because the one child that's not his was ill, and so they weren't going to bring the other two children for him to visit, they told him. And I think he may have missed a visit but had advised them ahead of time that he couldn't get transportation in order to make it to that visit. So for the court to make a finding that he had a lack of contact with his children and therefore that made him somehow unfit isn't supported by the evidence. Well, I think more of the evidence was he refused to fill out, I guess he had like 20 questions, I don't know how many questions there were. Right. So the other issue was that he refused to participate, well, the other issue for the court was that he refused to do these services that he was told to do by UCFS. And I believe they included a substance abuse assessment, a mental health assessment, and maybe some parenting classes. And his refusal to do those was based primarily on the fact that he didn't understand why he had to do any services. He said, I haven't done drugs, I don't have any mental health issues, I don't have any problems caring for my children, and so why does UCFS want me to go through all this? Well, he's not living by the children originally. Not living by the children? With them. Well, right, not living with them. So he wasn't living with the children, so the court is going in there doesn't know anything about the relationship. I assume, because he's not even living with the children. Right. So the DCFS is going to fill out this form, or do these things, and he says no. Right. So the court still doesn't know anything about it. Right, but the issue here is not my client. Keep going, that's okay. The issue here is Ms. Abbott, the issue has never been my client, and when I asked DCFS, why did you recommend substance abuse? Why did you recommend mental health? Why did you recommend parenting? Their response, those are our baselines, and so that's why we recommended them. And, Your Honor, just real quick, I think the most important case for this appellate court to look at on this whole issue is people versus Kevin S., which is the case that says the court isn't allowed to make assumptions. The court has to require evidence and can only base its decision on evidence that is in front of it, and there's no evidence that my client needed any sort of services. Thank you. You'll have the opportunity to respond, Ms. Blackburn. Thank you. Ms. Shanahan. May it please the court, counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. Before I get to the substantive portion of my argument, I'd like to answer, sort of answer, your question about the October 16th. I thought it was November is what I heard. Excuse me. Sorry. It's okay. I can't entirely answer it from my notes. Counsel may be correct. Because what I have in my notes is that a temporary custody order was, you know, on that day. Okay. But we don't know whether or not there was, in fact, a hearing. Correct. And she may be correct. Okay. Thank you. Having said that, counsel concedes that her client knew about this hearing just like the day after the first actual hearing a week earlier in November. I'm assuming since counsel says that the adjudicatory hearings are not in dispute, that they are conceding the first three temporary custody issues, which I believe this court doesn't have jurisdiction to even consider because they could only be appealed under the Supreme Court Rule 306A5. And there was no petition for leave to appeal, and it's months later. And I think those have to be on notice filed in 14 days. So moving on then to the propriety of the trial court's order as to fitness, one thing we need to be very clear about is that, contrary to respondents' opening brief, this is not unfitness under the Adoption Act. It's a lower standard of proof, and the focus is not, counsel says, the focus wasn't on her client, it was on the mother. The focus was not on either one of them. The focus was on the best interest of the children. At this point in time, that's the focus, is what is best for the children. And as I say, it's a much less rigorous standard than unfitness that terminates parental rights. Nobody's taking kids away at this point. They just need a place to put them. I think that at the end of the hearing, the trial court told the respondent that he should now know why he was not immediately notified about the children's removal, and that was because they couldn't get in touch with him. Now, he says, oh, I just lived down the road. But his wife, although he wasn't living with her, said she didn't know how to get ahold of him. His aunt, the children are actually released, said as far as she knew, he hadn't been involved in their lives for at least a year. And here's what I think is really important. His mother didn't know how to get ahold of him. How did the defendant find out about this? The aunt tells the mother, the mother calls the uncle, and the uncle calls the defendant. Now, if the defendant's mother doesn't even know how to get ahold of him, he's not near as easy to find as he claims he was. So he wasn't living several houses down? I think she just said three miles away. Oh, three miles. I believe that's what she said. No, not just several houses down. And so I think that's, if your wife doesn't know where you live, and your aunt doesn't know where you live, and your mother doesn't know where you live, or at least can't get ahold of you, I'll put it that way, she couldn't get ahold of him. And it's midnight. Yes, the mother's the one who immediately did something wrong. It's midnight. His children have to be placed somewhere. The mother says, I don't know where he is. The aunt, who was there that night, says, I don't. As far as I know, he hasn't been involved in a year. And as I say, the record indicates that even the mother's, the defendant's mother, didn't know how to get in touch with him. He did find out quite quickly, but it was aunt telling mother, mother asking uncle, and uncle telling respondent. So there were really two reasons why the trial court found respondent to be unfit under this section. One is that he did not cooperate with DCFS at all. And the other is that he had not seen a regular presence in these children's lives for years. Starting with the lack of cooperation, a service plan was initiated about a month after the children were removed. And a few weeks after that, respondent signed the service plan. So the service plan was initiated, and he knew what he was required to do. He refused the initial intake interview. I mean, that was just as well. So she said, nobody knew anything about him. He refused to tell them anything about himself. He didn't say he had to answer any questions about himself until and unless he got this answer to why he wasn't immediately notified that these children had been removed. He refused. He wouldn't say anything. So DCFS doesn't know anything about this man, and as I will get to in just a moment, he had been an absentee father, so he won't answer basic questions. I mean, the prosecutor noted to the trial court that had the respondent participated, the result could have been that the respondent didn't need any services and the children would have been awarded to his custody. All he had to do was tell them something about himself. He refused to do that. They know nothing about him. So they focus on three quite general areas, which this DCFS worker indicated are general areas that they always want to know about parents. Does he have any violent or abusive tendencies? Does he have any problems with alcohol or drugs? And is he mentally stable and knowledgeable enough to care for two children? They didn't say he had violent and abusive tendencies and therefore had to go get treatment for it. They did not say that he had problems with alcohol and drugs and therefore had to go get treatment for them. They did not say that he didn't know how to take care of these children and therefore had to take parenting. They just wanted to know something about him, And that's all they asked was that he go do an intake interview or at least go talk to them and tell them the basics of these three things. And he was not asked to undergo any treatment at all. He was given a packet of information, but he didn't feel like he needed to answer it. And I think significantly the guardian ad litem believed that it was extremely reasonable for that respondent to undergo this initial intake interview and these initial evaluations. If he had no drug problems, no alcohol problems, and he very well likely, I don't know, DCFS didn't know, the trial court didn't know. So that's the first reason. The second reason is that he had not been a regular presence in the children's lives for years. And here I have some disputes with time frames contrary to what the respondent has argued. The respondent's wife said that he was not involved in the children's lives. Respondent's aunt, and it is, I feel quite unpositive, it's his aunt, not his wife's aunt, but she says that he had not been involved, and her words were, for a year or so. And most importantly, respondent admits this tenuous connection he had with his children. He had not lived with the children since 2011, and we are talking about 2018. His most recent visit, and he calls it a visit, but what this visit is, is that respondent's on Facebook, and his son pops up there. That's what he's calling a visit, is that not him initiating the contact, but his son is on Facebook and types in something. That was in August 2017. That's not a visit. Prior to the Facebook visit, the last time he had seen his children, and this is by his own testimony, the last time he had seen the children was in July 2017. So that is, we're disputing facts here, but that's what I read from the record. July 2017 is four months before DCFS first became involved in this case. So he had not seen, laid eyes on his children for four months before DCFS became involved. And before that, respondent said he wasn't sure when he saw the children last, and that the last time he had seen them for more than a week was 2016. And I think what this establishes is that we've got a father who, by his own admission, has not spent more than a week with these children in two years. I think knowing something about his parenting skills is important. I emphasize this. Nobody said you have to go take parenting classes and pass them before you can have a... They just wanted to know something about him. So, and then, although the respondent's wife, he and his wife, had an agreement that he could visit with those children every week, clearly, he wasn't taking advantage of it. And he hadn't seen them in four months. Here's something that's important, I think. Although he told his wife he would pay child support, he had not paid child support since 2011. Justice Walsh, answering your question as best I can from my notes, the other son that died, died in 2016. And he said he was having, that it was a rocky time, understandably, a rocky time for him, and that he was having problems. And here's another important thing that I think that Guardian Ed Wyden commented on. If I'm DCFS, I think it's worth, at this point, a mental health evaluation, which he's refused to do. And since DCFS has taken, been involved in the case, respondent is correct, he has visited regularly, but DCFS also noted his negative attitude, his failure to cooperate, they knew nothing about his ability to parent. I would really like to talk about NRAKS, I believe it was opposing counsel, except Kevin asked the same case, because that's where they really rely on the alleged error in this case. NRAKS is not simply distinguishable law, and it's not simply bad law, it's not the law at all. As far as distinguishable, as respondent concedes in the opening brief, these cases are all sui generis. Second of all, in KS, the respondent didn't get a hearing at all, whereas here, respondent got a complete hearing, got the chance to cross-examine witnesses, got the chance to call his own witnesses. So it's entirely different. But here's the important thing, is that KS is just wrongly decided. Think about this. If KS stands for the proposition that refusal to comply with DCSF evaluations or service plans results in a lack of evidence at a dispositional hearing, then any parent can retain custody of their children simply by not cooperating. I don't have to do anything, and you can't use that other stuff to prove anything that I did. That's just contrary to common sense and contrary to the statute, 705 ILCS 405-2-22, which says hearsay evidence is properly admitted in a dispositional hearing. That's what this is, is hearsay evidence, and that's what was in KS. I mean, in KS, this man had been accused of six offenses. May I continue? You can basically finish that law. Yes. I direct this Court to the well-reasoned dissent in KS by Justice O'Malley, which points out every one of the problems with KS. And it's just KS says you can't use hearsay. The statute says you can. KS is wrong. Thank you, Ms. Dunham. Ms. Blackburn, you're rebuttal. First, to clear up the ongoing issue about the November 16th hearing, if you look at that order from the November 16th that's file stamped November 16, 27, it says on there the date of the hearing was November 9th. And so there was no further hearing. Right. It was a recordation of the order. Right. There was no second shelter care hearing until we filed our motion to vacate in June and then had a second shelter care hearing at that point. Well, we said hearing on the motion to vacate, I guess. All right. First, Your Honor, with regard to KS, KS has been around since 2006. Not been overturned. Not been, for the purposes that we rely upon it, not been in dispute. And so I'm not sure how anyone can say KS is not good law. I mean, KS is good law according to the appellate court, I realize not of this district, but certainly an appellate court from the state of Illinois and is frankly the most closely on point case that I was able to locate concerning the issue that is before this court. And I think there is a number of pieces of language from KS that are relevant and frankly decisive, I believe, on the issue that is before this court. And one of those is that the court, and I quote, says, the best interest of a child may require the court to order the state to present evidence to prove an allegation, but it cannot require a parent to prove that an allegation is false. So let's remember that in this case, there are no allegations against my client, none. All of the allegations here are against Samantha. My client is only a participant even with DCFS because of what his wife did while his children were living in her care. But for that, my client would not be involved with DCFS at all. And for the state to use the fact that his child passed away and the guardian had lied to him in some offhanded closing remark to say that because of that, maybe we ought to have a mental health evaluation. That child died over a year before we came to hearing, before the initial hearing, the November 2017 hearing in this case. If there were concerns about my client's mental health and his involvement with his children by Samantha or by anybody else who was involved with them during that period of time, certainly they could have brought that to DCFS's attention and DCFS could have dealt with my client on that issue. So had it not been for what happened with Samantha, we would still not be addressing an issue about my client's mental health. And so I don't think it is appropriate for anybody to be suggesting that my client needs some sort of mental health treatment because he's dealing with the death of a child. And while we're talking about the guardian ad litem, I think it is important to note here, this guardian ad litem did not testify. This guardian ad litem did no independent investigation, even to the point of meeting with the children. Everything that this guardian ad litem knew about this case, this guardian ad litem knew because of the documents that were filed with the court. Nothing else. So for this guardian ad litem to take a position that my client needed some sort of treatment based upon, frankly, my own client testified to that. It's not like DCFS had him up on the, excuse me, the state had him up on the stand and said, well, isn't it true that you lost a child in 2016 and you're suffering mentally because of it? That is something my client testified in response to my questions, being very open and honest with the court about when there had been a lack of parenting time, why there had been a lack of parenting time. Your Honor, I also think that it is interesting to me that the state makes an argument that my client's not living with the children, therefore that somehow makes him unfit. My background is in family law. That is primarily what I do. If we judged every set of parents in my world based upon the fact that they don't live with their children or because they may be absent from their children's lives for periods of time, that's like saying, and I know this isn't my client, but that's like saying if you live out of state and you can only get here to see your children once a month, then you're unfit because you're only seeing your children once a month. That is preposterous. That is absolutely preposterous in the world we live in today. Thank you. Thank you. Thank you both. We stand here in the platform for your briefs and arguments and we'll take the matter under five-minute window ruling.